[No. 6004-3-II.   Division Two.   May 21, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. KENNETH LOGAN WELKER, *Appellant.*

*James D. Hamilton,* for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney,* and *Richard Melnick, Deputy,* for respondent.

REED, J.—Kenneth Logan Welker appeals his jury convictions of first degree rape and first degree burglary. We affirm.

A somewhat lengthy recitation of events leading to Welker's arrest in the downstairs portion of his home at about 3:30 a.m. is necessary to the search and seizure issue, the primary issue on appeal.

At 1:47 a.m. on July 6, 1981, the Clark County Sheriff's office received a telephone call from a woman who said that she had just been raped. Within minutes Sergeant Harrison and Deputy Manchester responded to the scene. They

determined that the attacker had entered the victim's home through a sliding window, had kicked in the locked bedroom door in order to reach the victim, and had gone out through the garage into the backyard. Steps were taken immediately to protect the exit from contamination until a canine unit could arrive.

From the victim the officers obtained only a partial description of the attacker. Until he fled, she had been unable to free herself from the pillowcase he had placed over her head. The victim described her attacker as 6 feet tall and weighing 175 pounds, with a full, dark beard. She also told the officers that she had resisted the attack by pulling on his beard and head hair and had scratched the left side of his face.

At about 2:20 a.m., approximately one–half hour after the crime was committed, Deputy Meats arrived at the victim's home with his police dog. The dog was instructed to track commencing at the point where the attacker was believed to have emerged into the yard. Pulling Deputy Meats, with Sergeant Harrison following, the dog tracked south across the backyards of the victim's neighbors and then east toward the street, passing between two houses. The dog continued tracking south for two or more houses but then lost interest in the track. This indicated to Deputy Meats that the dog had lost the scent.

Meanwhile, as they had passed between the two houses, Sergeant Harrison had noticed a light on in the lower level of one known to be the residence of Kenneth Logan Welker. Sergeant Harrison had investigated Welker in connection with five earlier cases of trespass for peeping tom incidents, three of which resulted in convictions. For this reason, he also knew Welker's physical appearance and modus operandi. The victim's description of her assailant and the modus operandi of the current crime fit Welker.

Suspicion having focused on Welker, Sergeant Harrison decided to make inquiries at Welker's home. As he approached the house he saw a male figure silhouetted in the kitchen window in close proximity to the door. This

person reacted as if he was aware of the officer's presence. However, when the door was finally opened after 5 to 7 minutes of loud knocking and doorbell ringing, it was opened not by a man but by Nellie Welker, defendant's mother, accompanied by Dianna Welker, his wife. Dianna told the sergeant that Welker was not home. She said he had gone fishing with a friend but could not name either the friend or the fishing site. Sergeant Harrison, with Dianna's consent, was allowed into the upstairs kitchen and the downstairs bedroom Welker shared with his wife, the room where the light had been seen during the track. Finding no one, the sergeant left.

About 45 minutes later Sergeant Harrison returned with Deputy Manchester. In the interim he had picked up a camera for use in the investigation and had delivered it to the victim's house. Harrison found Nellie Welker outside conversing with a neighbor. Nellie said she had heard a prowler. Telling her that he would investigate, the sergeant said he wanted to talk to Dianna. He and Deputy Manchester were again invited inside where Harrison confronted Dianna with the fact that he did not believe her story about her husband's whereabouts. While still talking in the kitchen, they heard a banging noise. Nellie, acting out the prowler story, said it came from outside. Investigation there and in the garage revealed nothing. Sergeant Harrison, believing all the time that the noise came from downstairs, asked to look there. Nellie and Dianna objected strenuously. Nevertheless, Sergeant Harrison descended, followed by Deputy Manchester, Nellie, Dianna and the neighbor. He found Welker cowering naked under the stairs. Resisting throughout, Welker forcibly was pried from his lair. Fresh scratches were visible on the left side of his face. He was then arrested. Both then and later at the police station, he gave inconsistent explanations for the scratches.

Welker was charged with first degree burglary and first degree rape and with third degree assault on Sergeant Harrison. Welker's pretrial motion to suppress police observa-

tions of the scratches, evidence obtained through comparison of hair samples taken from Welker with hair found in the victim's bedroom, and statements made by Welker to police was denied. Using this evidence and more, the jury found Welker guilty of burglary and rape but acquitted him of assault.

Welker raises the following issues on appeal:

1. Was Sergeant Harrison's second warrantless nonconsensual entry into the downstairs level of the Welker home a violation of the fourth amendment to the United States Constitution?

2. Were the foundational requirements met for the admission of the tracking dog evidence?

3. Did the jury instruction defining serious physical injury for purposes of the first degree rape conviction specify harm that was serious enough?

4. Did the court abuse its discretion by denying defendant a continuance as a sanction for the State's failure to disclose the report of its hair comparison experts until the first day of trial?

First, Welker contends that the trial court erred in denying his pretrial motion to suppress police observations of the scratches, the hair comparison evidence, and certain statements made by him to police. The facts were never in dispute. It is only the trial judge's conclusions from those facts that are challenged.

■ Welker argues that a warrantless nonconsensual entry into a home in order to search for and arrest a suspected felon is unconstitutional absent probable cause and exigent circumstances, citing *Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980). With that statement of the general rule we are in agreement.

As noted in *State v. Counts*, 99 Wn.2d 54, 659 P.2d 1087 (1983), the "exigent circumstances" alluded to but not articulated in *Payton* have been cataloged in other federal cases. They are (1) hot pursuit; (2) fleeing suspect; (3) danger to arresting officer or to the public; (4) mobility of a vehicle; and (5) mobility or destruction of the evidence.

The trial court upheld Sergeant Harrison's second entry into the downstairs portion of Welker's home on the theory that the sergeant was then in "hot pursuit" of Welker— described by the trial judge as an "ongoing investigative pursuit," coupled with exigent circumstances and possible loss of evidence. Under the recent case of *State v. Counts, supra,* the search cannot be justified under the hot pursuit theory.

We do believe, however, that Sergeant Harrison's action can be justified under the exigent circumstances or destruction of evidence exception to the warrant requirement. Warrantless searches and seizures, although prima facie suspect, can be upheld if the exigencies of the situation are such as to make the forgoing of a warrant imperative. *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967); *McDonald v. United States,* 335 U.S. 451, 93 L. Ed. 153, 69 S. Ct. 191 (1948); *State v. Smith,* 88 Wn.2d 127, 559 P.2d 970, *cert. denied,* 434 U.S. 876 (1977); *see generally* 2 W. LaFave, *Search and Seizure* § 6.5 (1978). We are mindful that close scrutiny of the totality of the circumstances said to justify a warrantless search of a house under the doctrine of exigent circumstances is required in view of the alternatives either to (1) guard the premises while a warrant is sought, *State v. Counts, supra,* or (2) apply for a telephonic warrant, *State v. Bean,* 89 Wn.2d 467, 472, 572 P.2d 1102 (1978); CrR 2.3(c). Here, however, the evanescent nature of the evidence potentially available to identify the perpetrator, combined with the time of night, immediacy of the police investigation focusing on Welker, and Welker's undoubted knowledge that he was a suspect, made prompt police action imperative. *United States v. Minick,* 455 A.2d 874 (D.C.), *cert. denied,* __ U.S. __, 78 L. Ed. 2d 112, 104 S. Ct. 111 (1983).

Sergeant Harrison responded to a telephone call from the rape victim at 1:47 a.m. The rape had just taken place. The victim was able to give only a general description of her attacker. She said that he had a full beard which she had

pulled and that she had scratched the left side of his face. In light of the paucity of evidence then available to connect the attacker to the crime, quick action was necessary to identify and arrest him before evidence on his person could be irretrievably lost. It is well known to officers of Sergeant Harrison's experience that important "trace evidence," such as hair, fibers, bodily secretions, scratches and bite marks, is usually present in rape cases and that it is transient or short lived. If the attacker could elude capture long enough, this trace evidence could be washed or combed away and, in this case, the freshness of the incriminating scratches would be lost. *United States v. Minick, supra.*

Contrary to defendant's assertion, the exigencies of the situation had not dissipated during the 45–minute interval between Sergeant Harrison's first and second searches downstairs. If anything they had escalated. The suspicious explanation Dianna Welker gave him of her husband's whereabouts, coupled with the fact that the sergeant's knocking had not been answered by the male he had seen in the kitchen—and who he believed had seen him—gave Harrison reason to believe that Welker knew the police suspected him. Harrison's first search downstairs had revealed nothing. It was conceivable Welker had already fled, but the noise below was a fresh indication of his concealment in the home. The longer he delayed finding Welker the more certain it was that evidence would be irretrievably lost, and the need for prompt action to preserve that evidence was increased. *See State v. Davis,* 29 Wn. App. 691, 630 P.2d 938, 17 A.L.R.4th 53 (1981); *United States v. Minick, supra.*

In this case, keeping the house under surveillance while a warrant was obtained at 3:30 a.m., by telephone or otherwise, was not a practical alternative. Merely preventing Welker's escape would not preserve or prevent the loss of evidence which he carried on his person. *United States v. Minick, supra; Brooks v. United States,* 367 A.2d 1297 (D.C. 1976) and cases cited therein at page 1303. Welker had easy access to the household facilities to eradicate the

traces of his crime.

Nor do we believe State v. Holmes, consolidated with *State v. Counts,* 99 Wn.2d 54, 659 P.2d 1087 (1983), dictates a contrary result. Although the Holmes court refused to find exigent circumstances in a fresh rape case, it did so because "[t]here is no indication . . . that the police had any cause to believe that the destruction of evidence was imminent." Quite the opposite is true in Welker's case. As we have stressed ad nauseam, undoubtedly Welker was aware that the police were closing in on him. He was hiding from them in a place where he had the means to rid himself of some of the incriminating evidence. More importantly, his victim could not positively identify him as her assailant; she could only generally describe him by approximate height and weight and as having a beard. Without more, it is extremely unlikely he would have been brought to justice.

We hold that there were sufficient exigent circumstances to justify the sergeant's warrantless entry into the basement to search for and arrest suspect Welker. *United States v. Flickinger,* 573 F.2d 1349 (9th Cir.), *cert. denied,* 439 U.S. 836, 58 L. Ed. 2d 132, 99 S. Ct. 119 (1978); *United States v. Kulcsar,* 586 F.2d 1283 (8th Cir. 1978).

Now as to probable cause to arrest. Defendant makes much of the trial court's conclusion of law 2 that probable cause to arrest arose *after* Sergeant Harrison spied the fingernail gouges. Defendant correctly points out that *Payton* requires probable cause to arrest at the time of initial entry. Although no conclusion of law directly addresses the presence or absence of such probable cause at the time Sergeant Harrison descended to the basement, that omission is not fatal to the State's position. In our view the undisputed facts demonstrate ample probable cause to arrest at that moment.

Harrison knew that Welker fit the general physical description the victim had given of her attacker. He knew that the modus operandi of this crime fit the profile he had developed on Welker from five earlier cases involving tres-

pass for peeping tom incidents—usually in his own neighborhood. Sergeant Harrison had followed the track of the dog, ending very close to Welker's nearby house. He saw a light on in the house at about 2:30 a.m., and a male figure in the window as he approached the front door. This person was similar in size and appearance to both the suspect as described and to Welker. However, his first search into the bedroom downstairs had not revealed the suspect. Either Welker had fled or was secreting himself within the home thus indicating consciousness of guilt. When Sergeant Harrison heard the banging noise downstairs on his return to the Welker house, he had additional evidence that the suspect was hiding in that location. *See State v. Gallo*, 20 Wn. App. 717, 582 P.2d 558 (1978); *United States v. Scott*, 520 F.2d 697 (9th Cir. 1975), *cert. denied*, 423 U.S. 1056, 46 L. Ed. 2d 645, 96 S. Ct. 788 (1976). Sergeant Harrison then had ample probable cause to look for and arrest Welker in the downstairs portion of the house. Of course, when the sergeant saw the bearded, naked Welker with fresh fingernail scratches on his face, attempting to secrete himself in the stairwell, the probabilities simply increased. The pretrial motion to suppress properly was denied.

■ Welker next argues that the evidence of the track made by the dog should have been excluded because an insufficient foundation was laid showing the dog's reliability. As a condition precedent to admission of tracking dog evidence it must be shown that:

(1) the handler was qualified by training and experience to use the dog, (2) the dog was adequately trained in tracking humans, (3) the dog has, in actual cases, been found by experience to be reliable in pursuing human track, (4) the dog was placed on track where circumstances indicated the guilty party to have been, and (5) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow.

*State v. Loucks*, 98 Wn.2d 563, 566, 656 P.2d 480 (1983).

Welker concedes that condition 4 was met. We find that all other conditions were met as well. Deputy Meats testi-

fied that he had been assisting in the training of police dogs for the last one and a half years under the supervision of a professional trainer and had been assigned to the canine unit for 4 months before the track of Welker. He and his dog had been trained to be a team by a professional trainer in a two–and–a–half week session. Meats had recently attended a week–long seminar on all aspects of canine tracking. The dog who did the track in the instant case had been with the police force since May 1980 and had been trained by a professional trainer to track humans. Deputy Meats had participated in the dog's training. Deputy Meats testified that his dog followed the track on July 6, 1981 with vigor, pulling at the leash. This evidence adequately establishes conditions 1, 2 and 5.

Defendant's primary argument is that the dog's reliability must be established by success in at least one actual case, not just in simulated training situations, citing *People v. Norwood,* 70 Mich. App. 53, 245 N.W.2d 170 (1976). We need not accept or reject the *Norwood* rationale that the dog's reliability must be shown from actual, nontraining cases because the condition was met here. Deputy Meats testified that his dog had successfully tracked human quarry on hundreds of occasions in practice. In addition, he testified that his dog had made one successful track of human quarry leading to an arrest and on two other occasions had tracked human quarry to a location where escape was made in an automobile. A proper foundation in all respects was laid for the admission of the tracking dog evidence.

Welker next argues that jury instruction 11 defining "serious physical injury" allowed the jury to convict him of first degree rape with less showing of harm to the victim than required by statute.[1] Jury instruction 11 reads:

---

[1] RCW 9A.44.040(1)(c) reads as follows:

"A person is guilty of rape in the first degree when such person engages in sexual intercourse with another person by forcible compulsion where the perpetrator or an accessory: . . .

"(c) Inflicts serious physical injury; . . ."

"Serious physical injury" means any bodily harm or hurt that is painful or hard to bear. It need not be a permanent hurt or injury.

Defendant's exception to this instruction was:

We feel that this instruction is improper and that it's a hybrid of serious physical injury and its definition, substituting its own phrase into its own definition. We feel that that is an inappropriate and incorrect statement of the law.

■ This exception did not advise the trial court that counsel believed the harm defined was not serious enough to satisfy the statute. Only those exceptions to instructions that are sufficiently particular to call the court's attention to the claimed error will be considered on appeal. *State v. Harris*, 62 Wn.2d 858, 385 P.2d 18 (1963). This claim of error was not preserved and we will not consider it.[2]

■ Finally, defendant argues that the denial of his motion for a continuance resulted in a denial of his right to confront witnesses and his right to effective assistance of counsel, both guaranteed by the sixth amendment to the United States Constitution. Welker claims that because the State did not produce its hair comparison experts' report until the first day of trial, his attorney had insufficient time to prepare his cross examination of these experts. The denial of a motion for a continuance is reviewed under the abuse of discretion standard even though Sixth Amendment rights are at issue. *State v. Barker*, 35 Wn. App. 388, 667 P.2d 108 (1983); *State v. Sutherland*, 3 Wn. App. 20, 472 P.2d 584 (1970). The trial court's decision will be disturbed only upon a showing that the defendant was prejudiced or that the result of the trial would likely have been different had the motion been granted. *State v. Barker*,

---

[2]The Legislature has not defined the term "serious physical injury," nor is there case law definition. In our view it is neither necessary nor desirable to attempt to do so in a jury instruction. The term speaks for itself, is adaptable to the type of injury in issue and permits argument both pro and con. The jury is usually told it may rely upon common sense and the "common experience of mankind." Judges and lawyers are no better able to explain such ordinary terms than the jurors themselves.

*supra.* Welker has shown no prejudice or likelihood of a different result.

At the time defendant made his motion he requested a continuance of 1 day. His attorney stated that he would be ready to commence the trial the next day. The attorney then had in his possession the handwritten report of the State's hair comparison experts and had access to an independent expert appointed for him by the court. The State did not call its experts until 6 days later. At that time defense counsel was given a typewritten copy of the experts' report. Welker has not shown that he was surprised by changes in the two reports or that they were different in any way. If his motion had been granted when made, the trial would have commenced only 1 day later giving his attorney 7 days to prepare his cross examination of the State's experts instead of 6. Welker has not shown why 7 days would have been adequate but 6 was not. Defendant having shown no prejudice flowing from the denial of a continuance, we need not determine whether the denial was an abuse of discretion.

Judgment affirmed.

PETRICH, C.J., and PETRIE, J., concur.

Review denied by Supreme Court August 10, 1984.