# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2018 MAY 29 AM 9: 42

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 75072-1-I |
|  | ) |  |
| Respondent, | ) | DIVISION ONE |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| DAVID ZACHERY MORGAN, | ) | UNPUBLISHED |
|  | ) |  |
| Appellant. | ) | FILED: May 29, 2018 |
|  | ) |  |

Cox, J. — David Morgan appeals his convictions for one count of first degree attempted murder, first degree arson, and first degree assault, all crimes of domestic violence. The trial court did not abuse its discretion in declining to dismiss these charges following Morgan's mistrial motion. And double jeopardy did not bar retrial of these charges. But police authorities seized Morgan's clothing from bags inside his hospital room without authority of law. The State failed to prove by clear and convincing evidence that exigent circumstances existed. That clothing was later admitted into evidence at trial. Accordingly, we reverse and remand for a new trial.

David Morgan and Brenda Welch were divorced and shared custody of their eight-year old daughter, K. Morgan spent three weekends per month with K. Welch would pick her up at Morgan's house on Sunday evenings.

On Saturday night, November 15, 2014, Morgan left K. with his mother. Morgan claims to have been sick. He was supposed to pick up K. before Welch arrived at his home on Sunday evening. But he told officers who interviewed him that he fell asleep.

Welch left her house around 6:25 p.m. on Sunday, November 16, 2014, to pick up K. from Morgan's. Around 7:00 p.m., a neighbor saw that Morgan's house was on fire. Firefighters arrived within minutes and found Morgan on the ground, in the driveway. A lieutenant, the first firefighter to arrive, repeatedly asked Morgan if anyone else was in the house. Morgan mumbled the word "garage," and handed the garage door opener to the lieutenant.

The door opener did not work because a bin was blocking the door. After getting inside, firefighters found Welch on her back, in a pool of blood. She had severe burns on her upper body. She also smelled strongly of gasoline. She was taken to Harborview Medical Center for observation and treatment.

Welch had a skull fracture with a pattern of head lacerations that resembled a garden tool found by the front door of Morgan's home. She suffered permanent injuries. She did not remember how she got hurt.

Morgan had blood on his hands and clothing but no lacerations. He had a small wound on his forehead and his hair was singed. He was taken to Swedish Edmonds Hospital for observation and treatment.

Officer Christopher Breault of the Lynnwood Police Department went to the hospital, where Morgan was in a room being treated for smoke inhalation.

He asked Morgan what had occurred that evening. Morgan spoke freely with the officer regarding his memory of events.

Later that same evening, two other police officials arrived at the hospital room to interview Morgan. During this interview, Morgan declined to give a recorded statement. Sometime during this interview, police seized his clothing, which was stored in several plastic bags located on the back counter of his hospital room.

Police arrested Morgan the next day, upon his release from the hospital.

The State charged him with attempted first degree murder, first degree assault, and first degree arson. Each charge included an allegation that it constituted a crime of domestic violence.

On the fourth day of Morgan's first jury trial, the trial court granted a mistrial due to prosecutorial misconduct. At the second trial that followed a short time later, the jury convicted Morgan on all counts. The trial court sentenced him accordingly.

Morgan appeals.

## DISMISSAL UNDER CrR 8.3(b) AND CrR 4.7(h)(7)(i)

Morgan first claims that he was entitled to dismissal of the charges with prejudice under CrR 8.3(b) and CrR 4.7(h)(7)(i) due to the prosecution's allegedly outrageous and prejudicial conduct. The court did not abuse its discretion in declining to dismiss the charges with prejudice on these grounds.

CrR 8.3(b) authorizes dismissal "due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which

materially affect the accused's right to a fair trial." CrR 4.7(h)(7)(i) authorizes the trial court to impose sanctions, including dismissal for discovery violations.

A trial court will only order dismissal of charges under CrR 8.3(b) if the defendant shows by a preponderance of evidence, arbitrary action or government misconduct and prejudice affecting the defendant's right to a fair trial.[1] Likewise, dismissal pursuant to CrR 4.7(h)(7)(i) is an extraordinary remedy that is only available if a defendant can show actual prejudice.[2]

This court reviews the trial court's decision for manifest abuse of discretion.[3] A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds.[4]

Here the prosecutor elicited an opinion from an expert witness that had not been disclosed in pretrial discovery. The State properly concedes that this constitutes "government misconduct."[5] However, Morgan still bears the burden to show that his right to a fair trial was prejudiced in a manner that could not be remedied by a new trial.[6] But the trial court specifically determined that Morgan could be given a fair trial. And he fails to point to anything in the record of the second trial to show he did not get a fair trial.

---

[1] State v. Puapuaga, 164 Wn.2d 515, 520, 192 P.3d 360 (2008).

[2] See State v. Krenik, 156 Wn. App. 314, 320, 231 P.3d 252 (2010).

[3] Puapuaga, 164 Wn.2d at 520-21; Krenik, 156 Wn. App. at 320.

[4] State v. Michielli, 132 Wn.2d 229, 240, 937 P.2d 587 (1997).

[5] See id. at 239-40.

[6] State v. Whitney, 96 Wn.2d 578, 580, 637 P.2d 956 (1981).

Instead, he argues that he was prejudiced by the loss of the jury selected in his first trial, especially since the media coverage of his case made it particularly difficult for him to obtain a second unbiased jury. But he fails to point to anything in this record to show why the original jury selected would have been any fairer than the jury selected at his second trial.

Moreover, while Morgan claims that he was subject to adverse pretrial publicity, the trial court disagreed. Morgan fails to present anything other than speculation to show that the trial court was wrong in its assessment of this issue.

Morgan also argues that the mistrial, followed by retrial, worked to the State's benefit. We see no persuasive explanation why, given the eleven-day delay between termination of his first trial and commencement of his second trial.

Morgan relies on State v. Martinez, as support for his contention that dismissal was appropriate due to the prosecution's allegedly "outrageous" conduct.[7] His reliance is misplaced.

In Martinez, the prosecution kept *exculpatory* evidence from Alexander Martinez until the middle of trial.[8] The exculpatory evidence was revealed right before the State rested.[9] The jury voted 10 to 2 to acquit, and the trial court declared a mistrial.[10]

---

[7] 121 Wn. App. 21, 86 P.3d 1210 (2004).

[8] Id. at 32-35.

[9] Id. at 32-33.

[10] Id. at 24, 29.

5

When the State moved to refile the charges, Martinez moved to dismiss based on double jeopardy and CrR 8.3(b).[11] The trial court agreed with Martinez, dismissed the charges, and the State appealed.[12]

This court affirmed. We noted that "dismissal under CrR 8.3(b) is an extraordinary remedy that is improper except in truly egregious cases of mismanagement or misconduct that materially prejudice the rights of the accused."[13] We then held that the prosecutor's withholding of exculpatory evidence until the middle of trial was "so repugnant to principles of fundamental fairness" that the trial court did not abuse its discretion in dismissing the charges.[14]

Here, the undisclosed evidence was not exculpatory. Rather, it supported the State's theory that Morgan was guilty of arson. It is true that the trial court found that the prosecution intentionally elicited an opinion that should have been disclosed earlier, but Morgan has failed to cite to any authority equating such conduct with a failure to produce exculpatory material or with other outrageous behavior. Moreover, dismissal pursuant to CrR 8.3(b) is a discretionary decision. Thus, affirming in this case is consistent with this court's decision to affirm in Martinez. In both cases, this court defers to the trial court's exercise of discretion.

---

[11] Id.

[12] Id.

[13] Id. at 30.

[14] Id. at 35-36.

Finally, Morgan argues in his opening brief that he was prejudiced because the mistrial forced him to waive his speedy trial rights. But he concedes in his reply brief that this argument was in error. Specifically, the last day for trial pursuant to CrR 3.3 was Monday, March 21 and trial began on that day. We need not further address this argument.

Morgan fails to show that he either could not receive a fair trial, or that he suffered actual prejudice that could not be remedied by retrial. Accordingly, the trial court did not abuse it discretion by refusing to dismiss the charges with prejudice.

## DOUBLE JEOPARDY

Morgan next argues that double jeopardy precluded a second trial, notwithstanding that he sought the mistrial that the court granted. He further claims that the prosecutor acted in bad faith by intentionally and repeatedly eliciting highly prejudicial testimony from the State's expert in violation of the trial court's discovery order. We disagree.

Both the federal and Washington constitutions protect persons from being put into jeopardy twice for the same offense.[15] Jeopardy attaches once a jury is sworn in.[16] In general, double jeopardy principles do not preclude retrial if the

---

[15] State v. Turner, 169 Wn.2d 448, 454, 238 P.3d 461 (2010).

[16] State v. Corrado, 81 Wn. App. 640, 646, 915 P.2d 1121 (1996).

7

mistrial was granted upon the defendant's motion.[17] This is true even if the defendant sought a mistrial due to prosecutorial error.[18]

Federal cases recognize one exception to the usual rule. If the prosecutor intended to goad the defense into seeking a mistrial, re-trial is precluded.[19] Other bad faith actions by the prosecutor are not enough.[20]

Washington courts have recognized the possibility of a slightly broader exception based on the Oregon Supreme Court's interpretation of its state constitution.[21] Under the "Oregon standard," double jeopardy precludes retrial if the prosecutor "knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal."[22] The difference between the federal and Oregon standards is quite narrow with the latter including cases where the prosecutor "harass[es] the defendant with what the prosecutor knows to be prejudicial error."[23] Washington courts have not yet decided whether this broader rule applies under the Washington constitution.[24]

---

[17] Oregon v. Kennedy, 456 U.S. 667, 673, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982); State v. Hopson, 113 Wn.2d 273, 280, 778 P.2d 1014 (1989).

[18] Hopson, 113 Wn.2d at 280.

[19] Kennedy, 456 U.S. at 676.

[20] Id. at 675-76.

[21] Hopson, 113 Wn.2d at 280 (citing State v. Kennedy, 295 Or. 260, 276, 666 P.2d 1316, 1326 (1983)).

[22] Id. (quoting Kennedy, 295 Or. at 276).

[23] Id. (quoting Kennedy, 295 Or. at 272).

[24] Id. at 277-78; State v. Lewis, 78 Wn. App. 739, 743, 898 P.2d 874 (1995).

Whether the prosecutor intended to goad the defendant into seeking a mistrial is an issue of fact for the trial court.[25] Likewise, a finding whether the prosecutor intended or was indifferent to the possibility of a mistrial is factual, and "[t]he trial court may infer its finding from objective facts and circumstances."[26]

We will not disturb the trial court's factual findings that are "supported by substantial evidence."[27] We review de novo any questions of law.[28]

Snohomish County Deputy Fire Marshall Edwin Hardesty investigated to determine the cause of the fire. He submitted a report characterizing the cause as "undetermined," and stating that he "could not rule out it was an incendiary fire" and he could rule out all natural and accidental causes. The report was provided to the defense.

Morgan moved to compel pursuant to CrR 4.7(a), asking the State to provide a summary of the opinions of its expert witnesses. The trial court granted the motion, and the State produced a memorandum summarizing Hardesty's opinion and stating that he was expected to testify that the exact cause of the fire was undetermined. In the same memorandum, the State provided that Mikael Makela, the fire investigator assisting Hardesty, signed off on Hardesty's report, and "it is expected that he would join in the ultimate conclusions listed above if called to testify."

---

[25] Lewis, 78 Wn. App. at 744.

[26] Id.

[27] Id.

[28] State v. Jackman, 156 Wn.2d 736, 746, 132 P.3d 136 (2006).

At the first trial, Hardesty testified that, from the nature of the fire, he concluded that some type of fuel or accelerant had been added to the room to sustain the fire. Based on Welch's condition and the gasoline on her clothing, Hardesty testified that he could not rule out that the fire was intentionally set. He could eliminate all accidental causes in the room of fire origin and could not rule out an intentionally set fire. He again classified the cause of the fire as "undetermined."

On cross-examination, Morgan's counsel questioned Hardesty about NFPA 921, a peer-reviewed manual that rejects a procedure called "negative corpus" in which the investigator uses a process of elimination to conclude the fire was intentionally set. Hardesty denied using that procedure.

The State later called Makela who testified that he agreed with Hardesty's conclusions. Towards the end of his testimony, the following exchange occurred:

> Makela: [Reading from the NFPA that] "An incendiary fire is a fire that is deliberately set with the intent to cause the fire to occur in an area where the fire should not be.
>
> Prosecutor: And do you believe that's what occurred in this case?
>
> M: Yes, I do.
>
> P: [Does the NFPA] reiterate anything about ignitable liquid?
>
> M. It does.
>
> P. What does it say?
>
> M: The presence of ignitable liquids may indicate that a fire was incendiary, especially when [they] are found in areas in which they are not normally expected.
>
> P: Did you find that in this particular case?

10

M. Yes.

P: And the last paragraph?

M: Absence of personal items prior to the fire, the absence of items that are personal, irreplaceable, or difficult items to replace should be investigated." Examples include . . . photographs, awards, . . . art, pets [and] the removal of important documents, e.g., fire insurance policies, business records, tax records, prior to the fire, should be investigated and explained.

P: In consideration of all of that, of the standards of what you both eliminated and what you found, do you have an opinion as to whether this is an intentionally set fire?

M: Yes, I do.

P: Which is?

M: Yes. It is an incendiary fire.[29]

On cross-examination, Makela testified that he had told the State of his opinion a few months before trial and had spoken with the prosecutor about his conclusion "[m]aybe three of four times."[30] He did not provide the State with a written report of his conclusions.

Morgan moved for a mistrial because the prosecution had failed to disclose in discovery Makela's opinion that the fire was intentionally set. The prosecutor initially claimed that Makela's testimony was consistent with Hardesty's. The trial court disagreed, noting that Makela had testified that his professional opinion was that it was an intentionally set fire.

---

[29] Report of Proceedings Vol. 5 (February 29, 2016) at 950-51.

[30] Id. at 951-52.

11

The prosecutor then claimed that he believed he had provided materials to the defense about Makela's opinions but would have to check. After a recess, the prosecutor corrected his earlier statement and informed the court that he had not intended to elicit this information on direct examination. The trial court determined that failure to disclose Makela's opinion was a violation of the court's discovery order and declared a mistrial.

Morgan then moved to dismiss the charges. The prosecutor responded that he had elicited far more than he intended and acknowledged that his questioning was "sloppy, inartful [sic], and unfocused."

The trial court disagreed with the prosecutor's version of the facts in its response. The trial court determined that the prosecutor had asked questions designed to elicit Makela's opinion that the fire was incendiary and that the "five minutes or so of testimony that was elicited cannot be attributed to a mistake." Nonetheless, it did not believe that the prosecutor's misconduct warranted dismissal but reserved the right to impose sanctions at the conclusion of the case. At the end of the second trial, the court determined that the mistrial was an appropriate and sufficient sanction and imposed no others.

Morgan argues that the second trial violated his double jeopardy rights because his motion for mistrial should not be considered as consent. He is wrong.

Morgan relies on State v. Rich, as support for this argument that he did not consent because he was presented with two equally unacceptable choices— to allow a mistrial or to proceed with a jury that was tainted by the prosecutor's

misconduct.[31] He is wrong because John Rich objected to the trial court's decision to grant a mistrial.[32] If Morgan was correct, no defendant seeking a mistrial due to prosecutorial error could ever be seen as consenting because he or she always faces a choice between giving up the first jury or continuing with a trial tainted by prosecutorial error.[33]

Morgan also argues that retrial should have been barred because the prosecutor acted in bad faith to goad him into requesting a mistrial or to prejudice his prospects for acquittal. He also argues the opposite—that the prosecutor "took a risk by eliciting testimony he knew he had not provided in discovery, presuming that the evidence would simply be stricken if defense counsel objected." He argues that the prosecutor's improper questioning, coupled with his subsequent false assertions, first that he had provided the information in discovery and then that he had asked the questions by accident, shows bad faith and thus the trial court erred in refusing to dismiss the charges. We disagree.

Under either double jeopardy standard, the more narrow one articulated by the United States Supreme Court in Kennedy or the broader Oregon standard recognized in Hopson, Morgan was not entitled to dismissal. Both require a "rare and compelling" set of facts before dismissal is warranted.[34]

---

[31] 63 Wn. App. 743, 821 P.2d 1269 (1992).

[32] Id. at 745-46, 747.

[33] See U.S. v. Dinitz, 424 U.S. 600, 609, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976).

[34] Hopson, 113 Wn.2d at 283.

The double jeopardy concerns presented in this case are very similar to those addressed by this court in State v. Lewis.[35] Andre Lewis was charged with second degree murder, and at his first trial the prosecutor repeatedly asked a witness about whether someone working for the defense had tried to get him to change his story.[36] Lewis objected three times and each time the trial court sustained the objection.[37] The trial court granted a mistrial concluding that the prosecution "had introduced irrelevant, prejudicial evidence that denied Lewis a fair trial."[38]

This court affirmed the trial court's refusal to dismiss the charges based on double jeopardy.[39] Turning first to the federal standard, the court observed that "the critical factor is the trial court's perception that the State's case is going badly and the prosecutor was looking for an excuse to start over."[40]

Here, there is no evidence that the prosecutor wanted to start over. To the contrary, the trial court specifically found that prior to the improper testimony, the State's case was strong.

Turning to the slightly broader Oregon standard, the court in Lewis, observed that retrial was barred if the deliberate misconduct of the prosecutor

---

[35] 78 Wn. App. 739, 898 P.2d 874 (1995).

[36] Id. at 741-42.

[37] Id.

[38] Id. at 742.

[39] Id. at 745-46.

[40] Id. at 743.

created a risk of mistrial, perhaps to avoid the serious danger of acquittal, perhaps to harass the defense, or maybe just to retaliate against defense counsel in some way. This court agreed with the trial court that the prosecutor's misconduct was serious, its questions prejudicial, and that the prosecutor had wrongfully persisted despite three sustained objections. Nonetheless, this court deferred to the trial court's "first hand observations and sound judgment" and its determination that the prosecutor's conduct was insufficient to bar retrial.

In this case, as in Lewis, the trial court did not find that the prosecutor either intended a mistrial or was indifferent to the possibility. It also recognized that it had the discretion to "weigh the balance of justice," and it determined that dismissal would not support the ends of justice.

As in Lewis, we conclude that the trial court did not abuse its discretion in determining that retrial was not barred by double jeopardy.

## SEIZURE OF MORGAN'S CLOTHING

### Exigent Circumstances

Morgan argues that the trial court improperly failed to suppress the evidence obtained from his clothing because the clothing was illegally seized without a warrant. He further argues that the subsequent warrant to analyze bloodstain patterns was unlawful because it was obtained based on evidence from the unlawfully seized clothing. We agree with both arguments.

As a general rule, a warrantless seizure is a per se violation of article 1, section 7 of the Washington Constitution.[41] There are a few "carefully drawn exceptions to the warrant requirement" including exigent circumstances.[42] "The exigent circumstances exception to the warrant requirement applies where 'obtaining a warrant is not practical because the delay inherent in securing a warrant would compromise officer safety, facilitate escape or permit the destruction of evidence.'"[43] The supreme court has identified five circumstances from federal cases that "could be termed 'exigent'" circumstances.[44] They include "(1) hot pursuit; (2) fleeing suspect; (3) danger to arresting officer or to the public; (4) mobility of the vehicle; and (5) mobility or destruction of the evidence."[45] However, merely because one of these circumstances exists does not mean that exigent circumstances justify a warrantless search.[46] There must be a true emergency and a warrantless search is unlawful if other, less intrusive, options were available.[47]

---

[41] State v. Tibbles, 169 Wn.2d 364, 370, 236 P.3d 885 (2010).

[42] State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009) (quoting State v. Duncan, 146 Wn.2d 166, 171, 43 P.3d 513 (2002)).

[43] Tibbles, 169 Wn.2d at 370 (quoting State v. Smith, 165 Wn.2d 511, 517, 199 P.3d 386 (2009)).

[44] State v. Counts, 99 Wn.2d 54, 60, 659 P.2d 1087 (1983) (emphasis added).

[45] Id. (citations omitted); see also State v. Terrovona, 105 Wn.2d 632, 644, 716 P.2d 295 (1986).

[46] E.g., Tibbles, 169 Wn.2d at 370; State v. Patterson, 112 Wn.2d 731, 735, 774 P.2d 10 (1989).

[47] State v. Cruz, 195 Wn. App. 120, 126-27, 380 P.3d 599 (2016).

In determining whether exigent circumstances exist, the court looks to the totality of the circumstances.[48] Six nonexclusive factors that may aid in determining whether exigent circumstances exist are:

> '(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) whether there is reasonably trustworthy information that the suspect is guilty; (4) there is strong reason to believe that the suspect is on the premises; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the entry [can be] made peaceably.'[49]

When reviewing the trial court's denial of a motion to suppress, we review challenged findings of fact for substantial evidence.[50] We review de novo whether exigent circumstances exist to justify the warrantless seizure.[51]

"The State bears a heavy burden" and "must establish the exception to the warrant requirement by clear and convincing evidence."[52]

The issue before us is whether, under article 1, section 7 of the Washington Constitution, the warrantless seizure of Morgan's clothing from the storage bags in his hospital room—a per se violation of the constitution—was done "under authority of law." Specifically, whether the State met its heavy burden to show that either the "exigent circumstances" or "plain view" exceptions applies.

---

[48] Smith, 165 Wn.2d at 518.

[49] State v. Cardenas, 146 Wn.2d 400, 406, 47 P.3d 127 (2002).

[50] Garvin, 166 Wn.2d at 249.

[51] City of Seattle v. Pearson, 192 Wn. App. 802, 811-12, 369 P.3d 194 (2016).

[52] Garvin, 166 Wn.2d at 250.

17

Here, CrR 3.5 and 3.6 hearings on Morgan's motions to suppress were held successively on February 4, 2016. There are written findings of fact and conclusions of law for the CrR 3.5 hearing. For unexplained reasons, the record contains no written findings or conclusions for the CrR 3.6 hearing that is now at issue.

Nevertheless, in a careful review of the record, we consider both the evidence presented at the hearing and the trial court's rationale for its decision to deny Morgan's motion to suppress the clothing evidence.

We first note that the trial court considered the written statements of Officer Breault and Officer Brad Reorda that were attached to Morgan's motion to suppress. It also considered the written statement of Sergeant Curtis Zatylny that was introduced into evidence at the hearing. The trial court found these statements insufficient to justify the seizure of the clothing.[53] The State does not contest this finding on appeal.

Thereafter, the State presented the testimony of Officer Breault, the only person to testify at the CrR 3.6 hearing. He was one of several officers who had testified at the CrR 3.5 hearing that immediately preceded the CrR 3.6 hearing.

During the CrR 3.6 hearing, Officer Breault testified that he arrived at Swedish Edmonds Hospital around 8:45 p.m. to obtain information from Morgan

---

[53] Report of Proceedings Vol. 1 (February 4, 2016) at 149-50.

and provide medical updates to police authorities.[54] He spent a couple of hours with Morgan, in his hospital room, without noticing Morgan's bagged clothing.[55]

Two detectives arrived to interview Morgan after the officer had been with him for a couple of hours. Officer Breault first noticed Morgan's bagged clothing when he left the room following the arrival of the detectives.[56] According to this officer, the clothing was "in several plastic bags that the hospital had provided and then placed on the back counter" of Morgan's hospital room.[57]

The record is unclear on who directed the seizure of Morgan's clothing. The officer testified that it might have been the two detectives or some other police official not present in the hospital room. What is clear is that he did not seize the evidence on his own.

He also testified that neither he nor anyone else sought Morgan's permission to seize the clothing. Moreover, he testified that neither he nor anyone else sought a telephonic warrant.[58]

Nevertheless, Officer Breault testified that, when dealing with clothing that may contain bodily fluids or gasoline, police procedure is to separate these items and package them properly depending on the type of evidence. He further testified that substances such as gasoline and chemicals rapidly dissipate and

---

[54] Id. at 158.

[55] Id. at 159.

[56] Id.

[57] Id. at 151.

[58] Id. at 162.

such evidence needs to be packaged quickly and efficiently to preserve it for later testing.

On cross-examination, he testified that he had no knowledge of the timing of dissipation for anything that might have been on Morgan's clothing.[59] He further testified that he could not testify about what chemicals might have been on the clothing.[60] He also testified that his incident report made no mention of why he assisted in packaging the clothing into the special arson bags that another officer brought to the scene.[61]

A few months after Morgan's clothing was packed, sealed, and taken to the crime lab, one of the two detectives that interviewed Morgan at the hospital on the night of the fire visually inspected the clothes and noticed blood spatter on Morgan's jeans and shirt. The clothing was sent to a forensic scientist with the Washington State Patrol Crime Lab, who performed a bloodstain pattern analysis.

Morgan sought to suppress both the clothing and the bloodstain pattern analysis. The trial court determined that the State had met its burden to establish exigent circumstances justifying the seizure of Morgan's clothes. However, it also determined that any testing for purposes other than the presence of accelerants was not justified by exigent circumstances and thus required a

---

[59] Id. at 161.

[60] Id.

[61] Id. at 163.

warrant. The trial court then suppressed the results of the forensic scientist's bloodstain pattern analysis because exigent circumstances no longer applied.

Morgan moved to reconsider the denial of the suppression motion based on the absence of any showing by the State that it was impractical to get a warrant to seize the clothing.[62] But the trial court denied the motion. It reiterated its determination that Officer Breault had to act quickly once he saw the bag of clothes to preserve any accelerant and avoid cross contamination.

Relying on this court's decision in City of Seattle v. Pearson, Morgan argues that the warrantless seizure of his clothing was not justified by exigent circumstances.[63] Morgan is correct.

In Pearson, this court determined that the natural rate of dissipation of THC in Tamisha Pearson's bloodstream did not justify a warrantless blood draw under the exigent circumstances exception.[64] This court held that the City failed to show that waiting for a warrant would result in losing evidence of the defendant's intoxication, and it "failed to show by clear and convincing evidence that obtaining a warrant would have significantly delayed collecting a blood sample."[65]

---

[62] Report of Proceedings Vol. 1 (February 17, 2016) at 191-92.

[63] 192 Wn. App. 802, 369 P.3d 194 (2016).

[64] See Missouri v. McNeely, 569 U.S. 141, 152, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013).

[65] Pearson, 192 Wn. App. at 816.

Here, the record at the CrR 3.6 hearing is devoid of any evidence showing that it was impractical to get a telephonic warrant once police noticed the bagged clothing in Morgan's hospital room. The only evidence from Officer Breault about telephonic warrants is that no one applied for one. Why the police did not apply for a warrant is not satisfactorily explained.

In Pearson, this court acknowledged that exigent circumstances may exist "only if the party seeking to introduce evidence of a warrantless blood test can show that waiting to obtain a warrant would result in losing evidence of the defendant's intoxication."[66] But absent such evidence, the natural dissipation of THC for example in a suspect's bloodstream, will not, by itself, constitute exigent circumstances.[67]

Applying that rationale here, we see no reason to relieve the State of its burden to show that applying for a warrant in this case would have resulted in the loss of whatever evidentiary value was in the bagged clothing. There is simply nothing in the record of the CrR 3.6 hearing on this critical evidentiary issue.

Notably, the record of the CrR 3.5 hearing shows that one of the two detectives who interviewed Morgan at the hospital on the night of the fire, during a break in questioning, contacted the on-duty homicide deputy prosecutor to determine how to proceed.[68] Thus, to the extent consideration of material outside the record of the CrR 3.6 hearing is proper, it appears that the means of

---

[66] 192 Wn. App. at 812-13.

[67] Id.

[68] Report of Proceedings Vol. 1 (February 4, 2016) at 103.

seeking a telephonic warrant were readily available. In our view, this buttresses the absence of evidence that exists at the CrR 3.6 hearing to show that application for a warrant was impractical.

We turn again to Officer Breault's testimony in support of the warrantless seizure. In Pearson, there was testimony that obtaining a warrant would typically take 60 to 90 minutes and the dissipation window was at least three to five hours.[69] Here, there was no testimony about what chemicals might have been on Morgan's clothing or what the dissipation rates for such chemicals were. Simply saying dissipation was likely is patently insufficient to support this seizure.

There was also testimony about the risk of cross contamination of the clothing evidence. While we do not dismiss this general concern, this record does not appear to support the argument. The bagged clothing remained undisturbed for hours on a shelf in the hospital room, while Morgan was almost constantly in the presence of police officers. He was not going anywhere. There simply is no evidence to support the view that anyone would have been successful in contaminating the evidence without the police being able to stop them.

The assessment of exigency requires a "careful case-by-case" analysis, and the seriousness of the crime being investigated is a factor.[70] Here, the seriousness of the crime weighs in favor of exigency. But that alone is not enough to overcome the need for a warrant. If officers could reasonably obtain a

---

[69] 192 Wn. App. at 815-16.

[70] McNeely, 569 U.S. at 152; Smith, 165 Wn.2d at 518.

warrant before seizing Morgan's clothing without significantly undermining the seizure, they had to do so.[71]

The State relies on State v. Welker to support its argument that the potential loss of evidence provided exigent circumstances justifying a warrantless seizure of Morgan's clothes.[72] Its reliance is misplaced.

In Welker, officers pursued Kenneth Welker shortly after responding to a reported rape in the neighborhood.[73] They knew Welker from previous investigations and came to his house to speak with him.[74] The officers were invited into the house by Welker's mother and wife but denied entrance to the basement.[75] They went down anyway and found Welker, cowering naked under the stairs.[76] They arrested him.[77]

The court held that exigent circumstances justified the warrantless entry into the basement because officers had a reasonable belief Welker was hiding there and was likely to quickly destroy any evidence of the rape that remained on his body.[78] The rape had been reported at 1:47 a.m., and an officer testified that

---

[71] McNeely, 569 U.S. at 152.

[72] 37 Wn. App. 628, 683 P.2d 1110 (1984).

[73] Id. at 630.

[74] Id.

[75] Id. at 631.

[76] Id.

[77] Id.

[78] Id. at 633-34.

trace evidence usually present in rape cases such as hair, fibers, bodily secretions and scratches is transient and short lived.[79] The court noted that "keeping the house under surveillance while a warrant was obtained at 3:30 a.m. . . . was not a practical alternative."[80] Specifically, because Welker had easy access to facilities inside the house "[m]erely preventing [his] escape would not preserve or prevent the loss of evidence which he carried on his person."[81]

Here, there was no such exigency, on this record. How Morgan, hospitalized for smoke inhalation while almost constantly in the presence of police officers interviewing him, could destroy the clothing evidence in his room is left unexplained. And the record shows that detectives were in telephonic contact with a deputy prosecutor, through whom they presumably could have applied for a warrant to seize the clothing. In short, this case is of no assistance to the State.

The State has failed to meet its burden to show that applying for a warrant would have resulted in lost evidence.[82] And the State failed to prove by clear and convincing evidence that exigent circumstances existed.

The State does not argue that this error was harmless. On this record, it could not so argue.

---

[79] Id. at 634.

[80] Id.

[81] Id.

[82] See Pearson, 192 Wn. App. at 816.

*Plain View*

The State asserts in its cross-appeal that even if the warrantless seizure was not justified by exigent circumstances, it was justified under the "plain view" doctrine. It argues that the trial court erred in believing that this doctrine did not apply because the seizure was not inadvertent. We again disagree.

Under the plain view exception, if an officer is conducting a lawful search and comes across an item "the incriminating character of [which] is immediately recognizable, that item may be seized."[83] The plain view exception to the warrant requirement imposed by article 1, section 7 requires "prior justification for intrusion," "inadvertent discovery of incriminating evidence," and immediate knowledge of the incriminating nature of the evidence.[84]

Here, Officer Breault did not decide to seize the clothing bag when he entered Morgan's room or at any time during the next few hours. Instead, he testified that he may have been directed by other officers—none of whom testified at the hearing—to seize the bag. His testimony shows that instead of making the independent decision to seize incriminating evidence in plain view, he assisted another officer who came to collect the clothing in a special arson bag. None of the authorities of which we are aware apply to this factual pattern.

In addition, the plain view exception requires that the officer immediately know that the evidence is incriminating.[85] The exception only applies if police

_____

[83] State v. Hudson, 124 Wn.2d 107, 114, 874 P.2d 160 (1994).

[84] State v. Kull, 155 Wn.2d 80, 85, 118 P.3d 307 (2005).

[85] Id.

officers have probable cause to believe the object or evidence is contraband "without conducting some further search, that is, the incriminating character must be immediately apparent."[86]

Here, the record shows that Morgan's clothing was inside apparently opaque hospital bags. And there was no testimony that Officer Breault detected the scent of gasoline or any other type of accelerant before he seized the bag. Therefore, as found by the trial court, the incriminating character of the evidence was not in plain view because neither blood nor other relevant crime information could be seen through the plastic bag. Officer Breault was not justified in seizing Morgan's bag of clothes as an item immediately recognized as incriminating evidence.

Accordingly, we reject the State's argument that the seizure of Morgan's clothing was justified under the plain view exception to the warrant requirement. There simply is no basis in this record to affirm on this basis.

*Bloodstain Pattern Analysis*

After the trial court suppressed the bloodstain pattern analysis results, the State obtained a warrant and Kim Duddy performed a second bloodstain pattern analysis. These results were admitted at trial. Morgan argues that the trial court erred in admitting these results because the initial seizure of his clothing was unlawful. He argues that "the results of the pattern analysis were not obtained independently of the unlawful seizure." We agree.

---

[86] Hudson, 124 Wn.2d at 118.

27

It is well-established that when an unconstitutional seizure occurs, "all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed."[87] Here, the search warrant was based on the affidavit of Detective Jorgensen. Detective Jorgensen stated that he "conducted a visual examination of Morgan's clothing" when it was sealed in the evidence bags. Based on that visual examination, Detective Jorgensen sought the warrant so that a bloodstain pattern analysis could be performed. Because the seizure was unlawful, the results of the bloodstain pattern analysis should have been suppressed.

### Harmless Error

This court applies a harmless error analysis when the trial court erroneously admits evidence that is the product of a warrantless search.[88] A constitutional error is harmless if the untainted evidence is so overwhelming as to necessarily lead to a finding of guilt.[89]

Morgan argues that the error here was not harmless because there were no witnesses to the crime, and the bloodstain pattern analysis was the only evidence indicating that he was in close proximity to Welch when she suffered her head injuries.

The State does not argue otherwise.

---

[87] State v. Ladson, 138 Wn.2d 343, 359, 979 P.2d 833 (1999).

[88] State v. Guloy, 104 Wn.2d 412, 425-26, 705 P.2d 1182 (1985), cert. denied, 475 U.S. 1020, 106 S. Ct. 1208, 89 L. Ed. 2d 321 (1986).

[89] Id. at 426.

The denial of the suppression motion constitutes reversible error.

Because we reverse on the bases explained, we only address those remaining issues that may recur at trial on remand. It is unnecessary to address the other issues raised in this appeal.

## MIRANDA

Morgan argues that his statements to the detectives who interviewed him in his hospital room should have been suppressed because they failed to advise him of his Miranda rights.[90] We disagree.

"Miranda warnings were designed to protect a defendant's right not to make incriminating statements while in police custody."[91] They are required "when an interrogation or interview is (a) custodial (b) interrogation (c) by a state agent."[92]

Whether an interrogation is "custodial" depends on whether the suspect's movement was restricted at the time of questioning.[93] The test is "whether a reasonable person in the individual's position would believe he or she was in police custody to a degree associated with formal arrest."[94]

We review a trial court's findings of fact following a CrR 3.5 hearing for substantial evidence and review de novo whether the findings support the

---

[90] See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[91] State v. Lorenz, 152 Wn.2d 22, 36, 93 P.3d 133 (2004).

[92] Id.

[93] Id.; see State v. Sargent, 111 Wn.2d 641, 649, 762 P.2d 1127 (1988).

[94] Lorenz, 152 Wn.2d at 37.

conclusions of law.[95] Unchallenged findings of fact are verities on appeal.[96] We review de novo whether an interrogation was custodial.[97]

Morgan only challenges the statements he made to the detectives, not to Officer Breault. The following testimony was introduced at the CrR 3.5 hearing.

Around 10:40 p.m., two detectives arrived at Swedish Edmonds to question Morgan. They were wearing civilian clothes, but they had badges. Officer Breault went into the hallway to give them privacy.

The detectives questioned Morgan until 11:30. They then left the room while a nurse provided medical treatment and assisted Morgan with the bathroom. The detectives resumed their questioning at 12:05 a.m. and questioned Morgan until around 12:45 a.m.

Morgan told the detective that he had come home from work and fallen asleep. He awakened by being struck on the head. He heard a voice that he thought might belong to Welch. He went downstairs through thick smoke and found the house on fire with Welch against the back wall. She was on fire so he ripped off her burning sweater and tried to pat out the flames. He ran outside and only then realized that Welch was not with him. At some point, he realized she was in the garage.

---

[95] State v. Radcliffe, 164 Wn.2d 900, 907, 194 P.3d 250 (2008); Lorenz, 152 Wn.2d at 30.

[96] Lorenz, 152 Wn.2d at 30, 36.

[97] Id.

One detective testified that he did not immediately suspect Morgan but this quickly changed once Morgan began answering the detectives' questions because his story did not match up with the physical evidence. For example, despite saying that he tried to put out the flames on Welch's burning sweater, Morgan's hands were not burnt. When the detectives returned to Morgan's room at 12:05 a.m., the conversation became "a little more confrontational." The detectives told Morgan that they believed he had assaulted Welch and started the fire. Morgan was arrested the next evening when he left the hospital.

Morgan challenges the trial court's statement in its oral ruling that the conversation between Morgan and the detectives did not rise to the level of an "interrogation" or "custodial interrogation." This statement is not part of the trial court's written findings and conclusions. Moreover, it is irrelevant unless the trial court also determined that Morgan was in custody when the detectives were interviewing him.[98] It did not.

Morgan challenges the trial court's factual findings that he was not under guard, not restrained, and was not under arrest. He also challenges the trial court's conclusions that he was not in custody to the degree associated with an arrest and thus Miranda warnings were not required.

Morgan argues that he was under guard and in police custody because the room was small, two armed officers were inside, and another uniformed officer was just outside the door. He further argues that the trial court erred in finding that he was "unrestrained" given that he was wearing an oxygen mask

---

[98] Id. at 36.

31

and "tethered to medical equipment," making it difficult for him to get out of bed and to need assistance to use the bathroom. Moreover, he was alone and without family, friends, or any other persons during the interrogation.

None of these arguments is persuasive in light of the evidence in the record that supports the trial court's findings and conclusions. First, there was testimony that law enforcement placed no restrictions on Morgan's movements, and he could have left the room at any time. Officer Breault testified that he was outside the door because the room was small and he wanted to give the detectives privacy, not because he was guarding Morgan.

In addition, to whatever extent Morgan was unable to leave the room without assistance, his lack of mobility was caused by his injuries, not any actions on the part of the detectives. In these circumstances, an accused is not "in custody" for purposes of Miranda because in order to constitute custody, the restriction on the suspect's freedom of movement must be police-created.[99] Although Morgan may have felt alone or that he was restricted by his medical condition or the presence of law enforcement, his psychological state is not relevant to the objective determination of whether law enforcement restricted his freedom of movement.[100]

Morgan relies on the Ninth Circuit Court of Appeals decision in United States v. Craighead, as support for his argument that he was in custody because

---

[99] See, e.g., State v. Butler, 165 Wn. App. 820, 827-28, 269 P.3d 315 (2012).

[100] Sargent, 111 Wn.2d at 649.

he did not feel free to leave.[101] His reliance is misplaced because Craighead concerned an interrogation by law enforcement in Ernest Craighead's own home.[102] The court recognized that, "[t]he home occupies a special place in the pantheon of constitutional rights" and its "the most constitutionally protected place on earth."[103] Also, in Craighead there were eight law enforcement officers from three different law enforcement agencies present, and the agents put Craighead in a storage room at the back of his house to interrogate him.[104]

Finally, although Morgan cites to the four factors listed in Craighead, including whether the suspect is isolated from others and whether officers told the suspect that he was free to leave, and claims that these factors must be considered under a "totality of circumstances" analysis, he is wrong. The court specified that those factors apply in determining whether an in-home interrogation was custodial.[105] In Morgan's case, the test is whether a reasonable person would feel that they are in custody to the degree associated with a formal arrest.[106] Under that test, Morgan was not in custody. Thus, Miranda warnings were not required during the interrogation.

---

[101] 539 F.3d 1073 (9th Cir. 2008).

[102] Id. at 1077.

[103] Id. at 1077, 1083.

[104] Id. at 1078.

[105] Id. at 1084.

[106] Lorenz, 152 Wn.2d at 37.

## JURY INSTRUCTIONS

Morgan argues that the trial court committed reversible error when it refused to instruct the jury that it must presume the fire was the result of accident or natural causes. We hold there was no abuse of discretion in declining to give this proposed instruction.

"Jury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law."[107] This court reviews a trial court's decision to reject a party's jury instruction for an abuse of discretion.[108]

Morgan requested a jury instruction that:

> Where a building is burned, the presumption is that the fire was caused by accident or natural causes rather than by the deliberate act of the accused.[109]

The jury was properly instructed on the elements of arson, that Morgan was presumed innocent, and that the State had the burden of proving those elements beyond a reasonable doubt. In light of these instructions, the trial court did not abuse its discretion in excluding Morgan's requested instruction.[110]

---

[107] State v. Clausing, 147 Wn.2d 620, 626, 56 P.3d 550 (2002).

[108] State v. Picard, 90 Wn. App. 890, 902, 954 P.2d 336 (1998).

[109] Clerk's Papers at 108.

[110] Picard, 90 Wn. App. at 903; see State v. Kindred, 16 Wn. App. 138, 141, 553 P.2d 121 (1976).

Morgan relies on State v. Smith, as support for his contention that the court's refusal to give the requested instruction is reversible error.[111] But his reliance is misplaced because in Smith, the court did not address what other instructions were given to the jury or whether those instructions would cure any error.[112] As recognized by the court in State v. Picard, the Smith opinion is "dubious authority for the proposition that failure to give an instruction that a fire is presumed to be accidental is reversible error."[113]

In addition, Morgan has cited to no evidence in the record that would support the presumption that the fire was of accidental or natural causes. The trial court did not abuse its discretion in refusing to give an instruction that is not supported by the evidence.[114]

We reverse the judgment and sentence and remand for a new trial.

Cox, J.

WE CONCUR:

---

[111] 142 Wash. 57, 252 P. 530 (1927).

[112] Picard, 90 Wn. App. at 903; see generally, Smith 142 Wash. at 58.

[113] 90 Wn. App. 890, 903, 954 P.2d 336 (1998).

[114] State v. Staley, 123 Wn.2d 794, 803, 872 P.2d 502 (1994); Kindred, 16 Wn. App. at 141.